**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ILA M. BRUNER,

     **Plaintiff,**

 -vs-           **Case No.  8:08-cv-1744-T-27GJK**

COMMISSIONER OF SOCIAL SECURITY,

     **Defendant.**

_____

## REPORT AND RECOMMENDATION

TO THE UNITED STATES DISTRICT COURT

 Plaintiff Ila M. Bruner (the "Claimant") appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability, disability insurance benefits, and Supplemental Security Income ("SSI") benefits. *See* Doc. No. 1.

**I.**  <u>THE ISSUES</u>

 Claimant assigns three categories of errors to the Commissioner's decision: 1) the ALJ erred at step two of the sequential analysis by determining that Claimant's mental impairments, knee problems, and obesity were not "severe" impairments, the combination of which should result in a finding of disability and the ALJ misrepresented the extent and severity of Claimant's degenerative disease; 2) the ALJ erred in weighing the evidence by failing to state the specific weight afforded to the opinions of Drs. Clements, including a GAF score of 50, Ranganathan, Braun-Hashemi, Arnold, Hostetler, and Webber, and by substituting his own opinion for that of

the treating physicians; and 3) the ALJ erred in determining Claimant's residual functional capacity ("RFC") by failing to utilize SSR 96-8p, by finding Claimant's credibility on fair, and by not mentioning the side effects of Claimant's medications. Doc. No. 8 at 1-15. Therefore, Claimant maintains the Court should reverse and remand the case to the Commissioner for an award of benefits or, in the alternative, remand for the ALJ to properly analyze Claimant's severe impairments.

The Commissioner argues that substantial evidence supports his decision to deny Claimant's claims. Doc. No. 11 at 1-23. The Commissioner maintains that: 1) the ALJ did not err at step two because: the record lacks any evidence of significant functional limitations due to Claimant's mental impairments; Claimant has a full range of motion in the knees with no effusions or instability and, other than crepitation, there is no evidence that Claimant's knee condition significantly limits her ability to perform basic work activities; Claimant did not allege any limitations imposed by her obesity and the record lacks evidence indicating any such limitations; and the ALJ did not misrepresent the severity of Claimant's back problems; 2) the ALJ did not err by failing to weigh the evidence and, alternatively, to the extent the ALJ failed to state the specific weight afford to various opinions and evidence, such failure is harmless error (citing *Wright v. Barnhart*, 153 Fed.Appx. 678, 684 (11th Cir. 2005)); and 3) the ALJ properly determined that Claimant's RFC (citing *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)). Therefore, the Commissioner maintains the Court should affirm the decision below.

For the reasons set forth below, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED.**

II.      <u>BACKGROUND FACTS</u>

Claimant was born on August 23, 1950 and she attended high school through the eleventh grade.  R. 56, 387.  Claimant's past employment experience includes working as a competitive retail pricing supervisor and an administrative assistant.  R. 102-05.  While working as an administrative assistant, Claimant's duties included creating and maintaining spreadsheets as well as taking telephone calls.  R. 105.  Claimant last worked on March 11, 2004 as an administrative assistant.  R. 389.

<u>MEDICAL RECORD</u>

1.  <u>Treating Physicians</u>

A.  **July 2, 1993 – November 29, 2004 – Dr. Pyke**

From July 2, 1993 through April 19, 2000, Claimant presented to various doctors for routine medical check-ups, preventative care, and treatment for sinus infections, the flu, and upper respiratory infections.  R. 265-79, 287-361.  The records reveal Claimant complained of pain and swelling in her muscles and ankles, but x-rays taken in 1993 and 1994 were normal.  R. 268-69, 271-72, 274-75.  On July 2, 1993, Claimant presented to Dr. Michael Korman, M.D., complaining of depression.  R. 278-79.  Dr. Korman referred Claimant to a community organization rather than formal psychological treatment.  R. 278.  Claimant continued to suffer from "some leg, neck and back aches" throughout the late 1990's.  R. 322, 340.  During the above described time period, Dr. George A. Pyke treated Claimant's pain with Ibuprofen and multivitamins and recommended she lose weight.  R. 340.  On November 3, 1998, Dr. Pyke

noted that Claimant was suffering from depression, but his records do not contain a referral or recommendation for mental health treatment. R. 314. On April 26, 1999, Claimant presented to Dr. Pyke complaining of pain in her wrist that shoots up into her arm. R. 306. Upon physical examination, Claimant's reflexes, motor strength, and sensory functions in her wrist were normal, but a cyst was apparent on Claimant's right wrist. R. 306. Dr. Pyke successfully treated the cyst with medication. R. 306. On July 22, 1999, Dr. Pyke's notes show that Claimant was losing weight and the pain in her wrist had subsided, but her knees were hurting when she climbed stairs. R. 300-01. Physical examination of Claimant's knees was unremarkable. R. 301. On February 8, 2000, Dr. Pyke's notes state that Claimant's physical examination "is essentially unremarkable except for the obesity." R. 298.

After moving back to Florida from Indiana, on October 8, 2004, Claimant resumed treatment with Dr. Pyke. R. 281-86. On November 29, 2004, Dr. Pyke took Claimant off of Effexor and prescribed Cymbalta. R. 281. Dr. Pyke recommended Claimant continue taking Ibuprofen and Darvocet as needed for pain, and provided a handicapped parking permit application to Claimant. R. 281.

**B. November 22, 2002 – March 5, 2004 – Dr. Hostetler**

On November 22, 2002, Claimant was treated by Dr. Dawn Hostetler, where she presented complaining of problems walking, stating that she trips all the time, felt back pain and fatigued. R. 190. Claimant reported that she had previously been tested for Lupus with negative results. R. 190. Claimant stated that Ibuprofen provides some relief of pain. Dr. Hostetler performed an x-ray series on Claimant's lumbar spine revealing mild joint space narrowing at the L1-2, but it was otherwise normal and showed no spondylolisthesis. R. 195. Dr. Hostetler

questioned whether the back pain was caused by arthritis and prescribed 800mg of Ibuprofen. R. 190. Regarding Claimant's fatigue and tripping, Dr. Hostetler's notes show she considered recommending a neurological evaluation. R. 190. On December 17, 2002, Claimant presented to Dr. Hostetler for a follow-up regarding her other symptoms. R. 189, 194. On February 8, 2003, Claimant presented with increased joint pain. R. 188. On March 10, 2003, Claimant presented with a cough and sinus drainage. R. 187.

On June 6, 2003, Claimant presented for a follow-up appointment with Dr. Hostetler after seeing a neurologist. R. 186.[1] Claimant reported that her symptoms come and go and the pain is elevated on some days. R. 186. Claimant stated that she experiences burning sensations in her arms and legs and tightening in her leg muscles. R. 186. Claimant stated that an MRI revealed spinal stenosis in the low lumbar spine and she was undergoing physical therapy for pain relief. R. 186. Dr. Hostetler's notes also reveal that the neurologist also recommended a pain clinic and aquatic therapy. R. 186. Dr. Hostetler ordered an MRI of the brain due to Claimant's equilibrium issues and placed Claimant on Tylenol and Darvocet. R. 186. On July 3, 2003, Claimant underwent a brain MRI revealing a small incidental pineal cyst, partially empty sella, mild small vessel ischemic disease, and an otherwise unremarkable MRI examination of the brain. R. 193.

On August 25, 2003, Claimant presented to Dr. Hostetler for a follow-up concerning her "on [and] off" fibromyalgia. R. 185. Claimant stated that the Effexor prescribed by Dr. Braun-Hashemi, the neurologist, helped with her emotions and pain from fibromyalgia. R. 185. Claimant stated that she wanted a "disabled placard" for her car because she falls when walking due to foot drop and has trouble climbing stairs. R. 185. Dr. Hostetler's note show that she

---

[1] *See* infra pp. 6-10.

filled out a form so Claimant could obtain said placard. R. 185. Dr. Hostetler's notes also show that she referred Claimant to an orthopedic surgeon for bone spurs in her knees. R. 185. On October 15, 2003, Claimant returned for another follow-up and she was taken off Vioxx because it elevated her blood pressure. R. 184. Dr. Hostetler's notes show that Claimant was "doing ok" on Effexor and recommended that she continue it. R. 184.

On January 6, 2004, Claimant presented to Dr. Hostetler stating that Effexor continued to help her pain, she was off Vioxx, and she used Darvocet for back pain. R. 183. Dr. Hostetler's notes recommended Claimant continue using Effexor for "depression." R. 183. On January 30, 2004, Claimant presented complaining of a sinus infection and seeking a refill of Effexor. R. 182. On March 5, 2004, Claimant continued to state that Effexor was helping the fibromyalgia, but she still had pain in the neck and shoulders. R. 181. Claimant stated she was using Ibuprofen and Darvocet for the pain. R. 181. Dr. Hostetler recommended an x-ray of the cervical spine. R. 181. However, the record does not contain said x-ray results or any other treatment notes from Dr. Hostetler.

**C. January 2, 2003 – September 16, 2003 - Dr. Braun-Hashemi**

On January 2, 2003, Claimant presented to Dr. Clare Braun-Hashemi, M.D., for a neurological consultation from a referral by Dr. Hostetler. R. 172. Dr. Braun-Hashemi's notes show that Claimant was fifty-two years old at the time of the initial consultation and had been suffering from "slowly progressive weakness in her lower extremities." R. 172. Claimant reported to Dr. Braun-Hashemi that she has difficulty climbing stairs, but she also has some knee problems which could account for said difficulty. R. 172. Claimant stated that she experiences muscle cramping, particularly in the calf muscles, foot drop, and stumbles sometimes. R. 172.

On January 2, 2003, Claimant was taking Ibuprofen, 800mg, and Premarin, 0.625 mg per day. R. 172. Claimant's review of systems was remarkable for "recurrent sinus problems, obesity, back pain, arthralgias, diarrhea, constipation, heartburn, hemorrhoids, bloating, gas pains, headaches that are described mostly as tension headaches, a complaint of diffuse weakness and tiredness." R. 172.[2]

On January 23, 2003, Dr. Braun-Hashemi performed nerve conduction studies on Claimant which revealed normal motor conduction of the following: 1) the left peroneal motor nerve; 2) the left posterior tibial nerve; 3) right peroneal motor nerve; 4) F-wave latency of the left peroneal nerve; and 5) left superficial peroneal nerve. R. 170. The nerve study revealed borderline prolonged F-wave latency of the left tibial nerve and abnormal sensory conduction of the left and right sural sensory nerves. R. 170. Dr. Braun-Hashemi's initial evaluation showed a "mildly abnormal EMG." R. 171.

> 1. There is electrodiagnostic evidence to suggest a very mild sensory neuropathy.
> 2. There is no electrodiagnostic evidence of sensorimotor peripheral polyneuropathy.
> 3. There is no electrodiagnostic evidence of myopathy.

R. 171. Dr. Braun-Hashemi stated the following regarding Claimant's condition:

> She underwent an EMG today that did show some very minor sensory neuropathy. This would not account for her clinical problems. The EMG did definitively rule out something such as Charcot-Marie-Tooth disease given the family history of a mother and brother with foot drop. . . . She does complain of considerable pain also in the anterior thigh, as well as fatigue and was told that she was diagnosed with fibromyalgia in the past. Certainly, that is characteristic of fibromyalgia, and I clinically cannot really find any evidence of her symptoms.

---

[2] The record on appeal appears to be missing the second page of Dr. Braun-Hashemi's January 2, 2003 evaluation. *See* R. 172-173

R. 169.  Dr. Braun-Hashemi's impression was sensory neuropathy and probable fibromyalgia. R. 169.

On January 30, 2003, Claimant underwent an MRI of the lumbar spine at the request of Dr. Braun-Hashemi.  R. 173-74.  The MRI revealed "end plate changes of the lumbar spine from degenerative disc disease with degenerative changes of the discs particularly at L4-5 and L5-S1 with annular tears at those levels."  R. 173.  Imaging of the L2-3 showed "mild broad-based disc bulge and mild to moderate facet degenerative change" with mildly narrowed neural foramen.  R. 173.  There was also mild central canal stenosis secondary to the mild to moderate broad-based disc bulge at the L2-3 level.  R. 173.  Imaging of the L4-5 revealed mild to moderate central canal stenosis and subarticular recess stenosis secondary to moderate broad-based disc bulge and moderate facet degenerative changes.  R. 173.  Imaging of the L5-S1 showed mild to moderate broad-based disc bulge and osteophyte complex with a more central broad-based disc protrusion. *Id*.  The MRI was positive for spondylosis with multilevel central canal stenosis and subarticular recess stenosis which is worse at the L4-5.  R. 173.

On February 13, 2003, Claimant presented to Dr. Braun-Hashemi for a follow-up appointment.  Dr. Braun-Hashemi's notes state the following:

> [Claimant] is continuing to complain of significant low back pain, and an MRI of her spine was obtained that did show some facet degenerative changes that would account for some of the back pain that she notices, especially when she bends and then tries to straighten.  But in addition, she notes lower extremity pain and some weakness that occurs with walking and standing better with leaning forward.  She does show some mild to moderate spinal stenosis, especially at L4-5 and L5-S1.  She does have disc protrusions.  We had a lengthy discussion about the various options at this point in time.  I will try to go ahead and give her a course of Solu-Medrol and begin physical therapy.  She may ultimately need a pain clinic, and if her symptoms should progress,

she may ultimately even need neurosurgery, but for now, we will
try a more conservative approach.

R. 168.    On May 9, 2003, Claimant presented to Dr. Braun-Hashemi reporting "some

improvement in her pain."  R. 167.  Dr. Braun-Hashemi notes that Claimant only underwent

three physical therapy sessions.  R. 167.  Physical examination revealed that Claimant weighed

240 pounds and had 5/5 strength throughout with the lone exception of the dorsiflexors being

4+/5. R. 167.  Dr. Braun-Hashemi's impressions were as follows:

> 1.  Moderate spinal stenosis, especially at L4-5 and L5-S1.  She
> really did not adequately go through physical therapy.    The
> increased dose of Relafen seemed to help, but the Solu-Medrol did
> not.
> 2.  Incidental pineal cyst by MRI.
> 3.  Very mild sensory neuropathy.

R. 167.  On August 7, 2003, Claimant presented complaining of "neck pain, shoulder pain, and

knee pain, where it 'burns like fire.'"    R. 166.    Claimant was placed on Effexor, an

antidepressant, at 37.5mg per day to be increased to 150mg per day.  R. 166.[3]  Dr. Braun-

Hashemi also recommended a muscle relaxant.  R. 166.

On September 16, 2003, Claimant appeared for her last visit with Dr. Braun-Hashemi.  R.

165.  Claimant stated that overall she felt better after being placed on Effexor and that her

attitude was better.  R. 165.  Claimant also stated that she was experiencing less pain.  R. 165.

Claimant reported that she was experiencing some nausea, but the after being placed on Vioxx,

she felt better.  R. 165.  Claimant stated that she was doing exercises for her neck, back, and

knees.  Claimant weighed 242 pounds and her strength remained 5/5 with the exception of her

dorsiflexors.  Dr. Braun-Hashemi's final impressions were as follows:

---

[3] Effexor is intended for treatment of major depressive disorder, generalized anxiety disorder, social anxiety
disorder, and panic disorder.   *See* Physicians' Desk Reference (63rd ed. 2009).

1. Moderate spinal stenosis.  She is to continue to do her back exercises and her symptoms are improved.
2. Incidental pilonidal cyst by MRI.
3.  Small vessel ischemic disease noted again by MRI.
4. Very mild sensory neuropathy.
5. Possible fibromyalgia.
6. Symptoms improved with a combination of Vioxx and Effexor. If her pain continues she may also benefit from . . . therapy.
7.  High blood pressure.  This may be related to the newly added Vioxx.

R. 165.  The record reveals that Claimant did not have a follow-up visit with Dr. Braun-Hashemi because she moved from Indiana to Florida.  R. 268, 395, 402, 405-06.

**C.  August 29, 2003 – May 7, 2004 – Dr. Arnold**

On August 29, 2003, Claimant presented to Dr. Todd Arnold, an orthopedic surgeon, on referral from Dr. Hostetler, for evaluation and treatment of "some bilateral knee pain, right greater than left."  R. 200.  Claimant reported that she has been experiencing pain in her knees "off and on" for many years, but over the past six months the pain in her right knee became progressively worse.  R. 200.  Claimant stated that she had been diagnosed with bone spurs in her knees and fibromyalgia.  R. 200.  Dr. Arnold reported that Claimant "has no mechanical symptoms, instability, loss of [range of motion], or chronic swelling."  R. 200.  Dr. Arnold's notes also show that Claimant has experienced "some, but not complete relief" of pain by taking Effexor and Vioxx.  R. 200.  Physical examination of Claimant's left knee was normal with normal sensation throughout, no pain through active or passive range of motion, no palpable tenderness, and a normal ligamentous exam.  R. 200.  Dr. Arnold did find "[s]ome crepitus at the patellofemoral joint."  R. 200.   Physical examination of the right knee showed a loss of range of motion at "0-3-115," and crepitus at the patellofemoral joint.  R. 200.  "She has slightly limited patellar motion without patellar apprehension."  R. 200.  Dr. Arnold's notes show that Claimant

10

had no significant pain or laxity from various stress testing of the right knee. R. 200. X-rays of the right knee showed "a very small spur at the proximal pole of her patella on the lateral view." R. 200. Dr. Arnold's assessment stated "she did not have any significant degenerative changes in her knees that would suggest that she needs to go forward with any surgical intervention." R. 201. Dr. Arnold recommended an aggressive home exercise program. R. 201.

On October 10, 2003, Claimant returned for a follow-up visit with Dr. Arnold. R. 199. Claimant reported that she had been compliant with her home exercise program, focusing primarily on her range of motion. R. 199. Claimant reported that she was around thirty percent better overall and stated she was having less pain at the end of the day and less pain with activities. R. 199. Claimant stated that she had stopped taking Vioxx and her pain had not significantly increased. R. 199. Upon physical examination, Claimant's left knee showed stable range of motion, crepitus and a normal ligamentous exam with no palpable tenderness. R. 199. Claimant's right knee showed "significant improvement" in range of motion and no pain or effusion. R. 199. Crepitus was also stable. R. 199. Dr. Arnold concluded that Claimant was "doing very well," and he recommended that she continue her home exercise program. R. 199.

On May 7, 2004, Dr. Arnold drafted a letter to the Office of Disability Determination regarding Claimant's application. R. 198. In the letter, Dr. Arnold reviews his above described treatment and he states the following:

> [As of October 10, 2003, Claimant] was making slow and steady progress towards being normal and she noted she was upwards towards 30% better overall simply with the physical therapy that she had started on. The ROM in her more involved right knee had improved to include extension. No palpable tenderness was present on that day. At that time I felt she should be seen for advancement of her physical therapy program and she was scheduled to check back with us 6 weeks later. I have not yet seen

> her back in for a follow up and from your letter I assume she is
> now living in Florida. . . . For her today [May 7, 2004] I still feel
> she has a prognosis, which is favorable, especially since she made
> 30% improvement over her very short course of physical therapy.
> Unfortunately I cannot comment on any other ability to do work
> related activities such as sitting, standing, walking, lifting,
> carrying, handling objects, hearing, speaking, and traveling as I
> have not seen her for in excess of 6 months. . . .

R. 198. The record does not contain any other treatment records from Dr. Arnold or any other

orthopedic surgeon regarding Claimant's knee problems.

### 2. Consultative Examinations

### A. June 2, 2004 – Dr. Clements – Mental Evaluation

On June 2, 2004, Claimant presented to Dr. Rosimeri Clements, a licensed psychologist,

for a mental health evaluation. R. 202-05. Claimant denied any problems with anxiety and/or

depression due to Effexor. R. 202. Claimant stated that she continues to look for work "all the

time." R. 202. Claimant reported the following the medical problems:

> [F]ibromyalgia (pain throughout the body), limited attention and
> concentration due to pain, arthritis in back that impairs her to sit
> and pick up items, slow gait due to fibromyalgia, muscles tense
> with shrinkage and stretching helps relieve tension, medication
> causes drowsiness, fingers hurt "so bad on computer", has a "foot
> drop" [toes curl under], has fallen and the last time was 2 weeks
> ago (loses balance).

R. 202. Claimant stated that she has had no previous mental health evaluation or treatment. R.

202. Dr. Clements noted that Claimant was taking Darvocet, Ibuprofen, Zantac, Effexor, and

Premarin. R. 203. Claimant stated that she only takes Darvocet when needed due to side effects,

such as headaches. R. 203. Since moving to Florida from Indiana, Claimant had not been

treated by any medical professionals. R. 203. Claimant stated that her "general physician" told

12

her to go to physical therapy, but "her insurance would not pay for the therapy and she could not afford it." R. 203.

Dr. Clements' general observations were as follows:

> She does limited driving due to pain. She was appropriately dressed and groomed, with good basic functioning and hygiene. She had not prominent gait abnormalities or gross motor coordination problems. She is 5'6" and weight: 230. . . . She has no fine motor shakes or tremors. Rapport was easily established.

R. 203. Dr. Clements' mental status examination revealed the following:

> She appeared . . . alert and well oriented, with no symptoms of psychosis. . . . She did not show suicidal or homicidal tendencies. She provided the personal history and it seemed reliable. Good recall of personal information. . . . Speech and thought processes were logical and coherent. . . . She had a full range of appropriate affects and appeared in no acute mental distress.

R. 203. Regarding Claimant's functioning and activities, she reported that she is easily tired after a short walk in the grocery store and she "wall walks due to fear of falling." R. 204. Claimant stated that she struggles to bend over due to arthritis, fibromyalgia, and weight. R. 204.

Dr. Clements opined that Claimant was able to handle her funds adequately and that her grandchildren were the major stressor in Claimant's life due their parents' problems. R. 204. "She depends upon others to initiate and maintain friendships," and her social life is inactive due to the recent move to Florida. R. 204. An average day's activities consists of watching television, cooking, playing cards with grandchildren, looking for work on the computer, and light housecleaning. R. 204.

Dr. Clements concluded that Claimant's prognosis is fair. R. 204. "There was no significant cognitive impairment; however, her level of pain and medication side effect (drowsy)

appears to be the cause of her limited attention and concentration. R. 204. Dr. Clements recommended continued medical and mental health care. R. 204. Dr. Clements' diagnoses were: 1) pain disorder associated with both psychological and multiple medical problems; 2) adjustment disorder with mixed anxiety and depressed mood, chronic; 3) sleep disorder due to multiple medical problems, insomnia; 4) fibromyalgia; 5) arthritic back; 6) foot problems; and obesity. R. 204. Dr. Clements also assigned a present GAF score of 50. R. 205.

**B. June 3, 2004 – Dr. Ranganathan – Physical Examination**

On June 3, 2004, Claimant presented to Dr. Ranganathan, M.D., an internist, for a disability related consultative evaluation and records review. R. 206-07. After reviewing Claimant's medical history, Dr. Ranganathan made the following findings upon physical examination:

> Handgrip is 5/5 and equal bilaterally. Gross and fine manipulations are well preserved. MOTOR SYSTEM STRENGTH: 5/5 and equal bilaterally. SENSOR SYSTEM: light touch sensation preserved and equal bilaterally. REFLEXES: 2-3+ and equal bilaterally. . . . GAIT: The patient is able to walk without assistive devices. Holding the wall, she was able to tandem walking a few steps. She refused to walk on the heel but she was able to walk on the toes backwards. . . . [Straight Leg Raising] negative in both the legs in supine position. Mild para cervical tenderness is elicited. No spasm. As I observed the patient, she was able to get on and off the examination table. She was able to take off the shoes and trousers. She was able to sit on the examination table and in the waiting room and I saw her walking down the hall. The patient was alert, awake, clean and neat. She was able to relate to my staff and me. There were no involuntary movements. She has a good attitude and she is cooperative.

R. 207. Dr. Ranganathan's impressions were: 1) degenerative joint disease of the lumbosacral spine and cervical spine; 2) history of fibromyalgia; 3) history of high blood pressure; 4) history

of depression.  R. 207.  Dr. Ranganathan did not offer an opinion as to Claimant's ability to work despite her impairments.  R. 206-07.

### C.    January 5, 2005 – Dr. Hasselbring – Physical Examination

On January 5, 2005, Claimant presented to Dr. Caryn G. Hasselbring, M.D., for a consultative examination at the request of her attorney.  R. 258-60.  Claimant stated that she had nerve conduction studies (EMG) and x-rays done in Indiana and was diagnosed with fibromyalgia and arthritis.  R. 258.

> She complains of "pain all over" most of which is aching.  She says her pain is worse in her legs.  She says her legs often hurt so much "I can hardly lift them".  She has difficulty getting up off the commode, she thinks because of weakness as well as pain.  She says "I fall and trip all the time."

R. 258.  Claimant stated she was taking Ibuprofen 800mg per day, Cymbalta 30mg per day instead of Effexor and it helped somewhat with her discomfort. R. 258.  Claimant discontinued taking Darvocet because it gave her headaches.  R. 258.

Upon physical examination, Claimant was "pleasant, cooperative, and morbidly obese" with a depressed affect.  R. 259.  Claimant demonstrated normal range of motion in the neck, shoulders, elbows, wrists, and hips.  R. 259.  Claimant was able to make a full fist, but did have mild bony hypertrophy at several PIP joints and Heberden's nodes at several DIPs.  R. 259. Although Claimant had a full range of motion bilaterally in her knees she did have "marked crepitance bilaterally."  R. 259.  No effusions or instabilities were present in her knees.  R. 259. Claimant's muscle strength was normal and her reflexes were 2+ and equal.  R. 259.  Claimant's range of motion in her lumbar spine was decreased in hyperextension, but she had good forward flexion.  R. 259.  Dr. Hasselbring's assessment was as follows:

1. Myalgias/arthralgias. She has definite evidence of [osteoarthritis] of the knees, lumbar spine, feet and hands. She does however also meet criteria for a diagnosis of fibromyalgia.
2. Morbid obesity certainly contributing to her lower extremity complaints.
3. Severe depression increased since the sudden death of her husband.

R. 260. Dr. Hasselbring recommended Claimant: discontinue taking Ibuprofen and begin taking Naprosyn 500mg per day; lose weight; rule out inflammatory or metabolic disorder; begin using a cane; avoid barefoot walking completely; and begin a regular exercise program immediately. R. 260. Dr. Hasselbring referred Claimant to vocational rehabilitation "to see if they can help get her back into the work force." R. 260. Dr. Hasselbring concluded that she "cannot really . . . state that she is fully disabled, particularly for a sedentary position such as she has had in the past." R. 260. Dr. Hasselbring's notes reflect there would be a follow-up in one month, but no additional records from her office are in the record. R. 260.

**3.** **Non-Examining Physicians' Opinions**

**A.** **June 25, 2004 – RFC Evaluation**

On June 25, 2004, a non-examining state agency consultant completed a Physical Residual Functional Capacity Assessment ("RFC") of Claimant. R. 210-17. The state agency consultant made a primary diagnosis of degenerative joint disease of the lumbar and cervical spine and a secondary diagnosis of a history of fibromyalgia as well as a history of high blood pressure and depression. R. 210. The state agency consultant opined that Claimant's conditions and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum of twenty pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walking about six hours in an eight hour workday; (4) sitting with

16

normal breaks for about six hours in an eight hour workday; and (5) no limitations in pushing and/or pulling. R. 192. The state agency consultant's opinions were based upon Dr. Ranganathan's report, November 2002 x-rays of the lumbar spine, and March 2004 x-rays of the cervical spine. R. 212. The state agency consultant further opined that Claimant had no postural, manipulative, visual, communicative, or environmental limitations. R. 212-14. Regarding the severity of Claimant's symptoms, the state agency consultant stated that they were "partially credible due to objective finding of degenerative changes of the cervical and lumbar spine." R. 215.

### B.      June 25, 2004 – Psychiatric Review Technique – Dr. Jung

On June 25, 2004, Dr. Nicole P. Jung, a licensed psychologist and a non-examining state agency consultant, completed a Psychiatric Review Technique ("PRT") based on a records review. R. 218-31. Dr. Jung opined that Claimant's medically determinable impairment(s) were not severe. R. 218. Although not severe, Dr. Jung found that Claimant suffered from affective disorders, anxiety related disorders, and somatoform disorders based upon adjustment disorder with depression, anxiety, and pain disorder. R. 218, 221, 223, 224. Dr. Jung opined that these impairments resulted in mild restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. R. 228. Dr. Jung stated that Claimant's depression and anxiety were effectively controlled with Effexor. R. 230. Dr. Jung further stated the following:

> [Claimant's activities of daily living] are essentially normal and
> seem to be limited by physical pain. The [Claimant] initiates
> cooking, cleaning, shopping and manages her household expenses
> independently and appropriately. . . . The [Claimant] states she
> gets along well with others and spends time carring [sic] for and
> playing games with her grandchildren. The [Claimant] states she

17

uses the computer to post her resume and look for employment. Summary – The [Claimant] is able to carry out simple instructions, make simple decisions and do routine tasks[s] within her physical limits. The [Claimant] has the ability to interact with others. The [Claimant's] current medication is effect[ive]. The medical evidence does not support a reduction in functioning that is reasonably attributable to a mental disorder, therefore the impairment is not severe.

R. 230. Thus, Dr. Jung concluded that Claimant's mental impairments are not severe.

### C.     October 14, 2004 – PRT and Mental RFC – Dr. Weber

On October 14, 2004, Dr. Theodore J. Weber, a clinical psychologist and non-examining state agency consultant, completed a PRT and Mental RFC based upon a records review. R. 232-49. Dr. Weber opined that a physical RFC was needed and found that Claimant suffered from an organic mental disorder characterized by sleep disorder, affective disorder characterized by adjustment disorder with depressed mood, anxiety-related disorders characterized by adjustment disorder with anxiety, and somatoform disorder characterized by pain disorder. R. 232-42. Dr. Weber opined that Claimant's mental impairments would have a moderate effect on her ability to maintain concentration, persistence, and/or pace, but only a mild effect on her activities of daily living and her ability to maintain social functioning. R. 246. After reviewing her records and statements, as well as the records from Dr. Clements, Dr. Weber found Claimant to be credible and concluded that "[t]he medical evidence supports a moderate reduction of functioning that is reasonably attributable to a mental disorder." R. 248.

Dr. Weber also completed a mental RFC assessment concluding that Claimant is moderately limited in her ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work-day and workweek without interruptions from psychologically based symptoms;

accept instructions and respond appropriately to criticism from supervisors; and to set realistic goals or make plans independently. R. 232-33. In all other areas, Dr. Weber concluded that Claimant was not significantly limited. R. 232-33. Dr. Weber found that Claimant is "capable of completing simple tasks on a regular basis at this time," and her "functional limitations are mainly attributable to physical condition[s]." R. 234.

### D. October 24, 2006 – RFC – Dr. Stone

On October 24, 2006, Dr. Violet A. Stone, M.D., a non-examining state agency consultant, completed a physical RFC assessment of Claimant. R. 250-57. Dr. Stone made a primary diagnosis of fibromyalgia and a secondary diagnosis of lumbar spondylosis. R. 250. Dr. Stone also noted that Claimant suffered from high blood pressure. R. 250. Dr. Stone opined that Claimant's conditions and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum of twenty pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walking about six hours in an eight hour workday; (4) sitting with normal breaks for about six hours in an eight hour workday; and (5) no limitations in pushing and/or pulling. R. 251. Dr. Stone's opinions were based upon a diagnosis of fibromyalgia in 2001, January 2003 MRI of lumbar spine showing spondylosis with multiple mild to moderate central canal stenosis, an EMG showing very mild sensory neuropathy, mild paraspinal tenderness, mild decrease in range of motion of the lumbar spine, good range of motion in the cervical spine, 5/5 motor strength in extremities, no evidence of foot drop, and intact reflexes. R. 252. Dr. Stone further opined that Claimant had occasional postural limitation in climbing, stooping, and crouching. R. 252. Dr. Stone found Claimant's condition results in no manipulative, visual, communicative, or environmental limitations. R. 252-54.

Regarding the severity of Claimant's symptoms, Dr. Stone stated that she does not suffer from any neurological deficit. R. 255.

## III. PROCEEDINGS BELOW

Claimant alleges an onset of disability as of March 11, 2004, due to fibromyalgia, arthritis, and foot drop. R. 11, 56, 62, 71, 80.[4] On April 26, 2004, Claimant filed the present application for a period of disability, disability insurance benefits, and SSI benefits. R. 56. Claimant remained insured through December 31, 2008. R. 13.

Claimant's application was denied initially and upon reconsideration. R. 34-44.[5] On December 2, 2004, Claimant requested a hearing before an Administrative Law Judge (the "ALJ") and, on January 24, 2006, a hearing was held before the Honorable John T. Yeary. R. 50, 380-410.

At the hearing, Claimant was represented by J. Michael Matthews, Esq. R. 380. Claimant was the only individual who testified at the hearing. R. 380-410. Claimant testified to the following in pertinent part:

- She is widowed and currently lives with her daughter, her daughter's husband, and their two sons;

- While working as an administrative assistant she began experiencing a lot more pain in her neck and shoulders;

- She stopped working on March 11, 2004, because she was falling regularly, experiencing a great deal of pain trying to sit and use the computer all day, receiving bad reviews as a result, and experiencing depression;

---

[4] At the hearing before the Administrative Law Judge (the "ALJ"), Claimant's counsel, J. Michael Matthews, Esq., asked the ALJ to consider amending Claimant's onset date from March 11, 2004 to January 1, 2005. R. 384, 408. In his decision, the ALJ did not amend Claimant's onset date, but Claimant has not raised the onset date as an issue on appeal. *See* R. 11-17; Doc. No. 8 at 1-15.

[5] At the reconsideration level, Claimant stated that she also suffered from "added depression." R. 110.

- On a bad day the pain radiates throughout her legs, lower back, shoulders, and neck;

- She can no longer use a computer mouse even if she props her arm up with a pillow;

- She has been diagnosed with dropped foot which causes her to trip and fall, fibromyalgia, and depression;

- The doctors told her they could not fix her pain because there is no cure for fibromyalgia, so she moved to Florida where she thought the warmer climate would help her pain;

- Dr. Hashemi diagnosed her with fibromyalgia and told her that a cane might help her ambulation;

- She does not have a prescription for a cane, but procured one on her own and she has used a cane for two years. She does not like using the cane, but she uses it whenever she is going to be walking for a long distance. If someone is with her, she can get by without the cane;

- While working as a competitive pricing supervisor, she had to drive some distances and she was on her feet and walking most of the day;

- While working as an administrative assistant she sat at a desk, did a lot of reports, and ordered supplies for 32 fuel centers;

- She is able to drive short distances such as going to grocery store and she was able to drive forty-five minutes one way to attend the hearing;

- While driving, she must prop both her arms up with pillows and constantly adjusts the seat;

- She is currently being treated by Dr. Gohill at a medical clinic in Leesburg, Florida;[6]

- On November 29, 2004, Dr. Gohill provided her with a handicapped sticker for her vehicle so she can park closer to buildings;

- She has placed her resume on the internet and has received numerous inquiries, but there is no work that she can perform. Sometimes she still checks the internet for inquiries on her resume, but her pain has become so severe that she can no longer use the mouse or sit at the computer;

- She has a hard time doing household chores; her grandson cleans her car, unloads the groceries, and carries the laundry;

---

[6] It appears that Dr. Pyke, rather than Dr. Gohill, is Claimant's treating physician. *See* R. 281-93.

- She makes sure the grandchildren do not miss their bus in morning and she tries to do as many household chores as she can, but some days she can barely get out of bed and some nights she cannot sleep. She cannot bend over to unload the dishwasher;

- She is not currently under psychiatric care, but she goes to church and talks with friends to help with her depression;[7]

- She enjoys reading the Bible, but it bothers her to sit and read because she cannot sit in one spot for very long. She does not watch television;

- She does some water exercises in the pool;

- She is able to dress herself and take care of her personal needs;

- She takes 800 milligrams of Ibuprofen, an anti-inflammatory medication, two to three times a day and she takes Darvocet when the pain is "really bad," but she tries not to take the Darvocet. She usually takes Darvocet at night to help her sleep. She also takes generic Zantac for stomach problems caused by the other medications;

- Darvocet makes her drowsy and dizzy;

- She can sit for about 30 minutes before having to stand up and stretch; she can stand for maybe 30 minutes before having to sit because she staggers a lot and she is afraid she will fall; she used to be able to walk a quarter mile before having to sit and rest, but now she cannot walk around the neighborhood because she is afraid she will fall and she has to hold on to something; and

- It bothers her to lift a gallon of milk, so she tries to only buy half gallons of milk.

R. 380-410.

On March 10, 2006, the ALJ issued an unfavorable opinion finding Claimant not disabled. R. 11-17. In his decision, the ALJ made the following pertinent findings:

1. Claimant meets the insured status requirements of the Social Security Act through December 31, 2008;

2. Claimant has not engaged in substantial gainful activity at any time relevant to this

---

[7] On April 28, 2004, during the initial consideration level, Claimant stated that she does not attend church anymore because of the pain. R. 95.

decision;

3. Claimant has the following severe impairments: fibromyalgia and degenerative disc disease;

4. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments;

5. After careful consideration of the entire record, [the ALJ found] that the Claimant has the residual functional capacity ("RFC") to work at the sedentary exertional level;

6. The Claimant is capable of performing past relevant work as an administrative assistant. This work does not require the performance of work-related activities precluded by the Claimant's [RFC]; and

7. The Claimant has not been under a disability as defined in the Social Security Act, from March 11, 2004, through the date of this decision.

R. 11-17.   In the decision, the ALJ stated that at step two of the five step sequential evaluation process he must determine "whether the [C]laimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'"  R. 12.  The ALJ stated that 20 CFR § 404.1521 provides that "[a]n impairment or combination of impairments is 'severe' . . . if it significantly limits an individual's ability to perform basic work activities."  *Id*. (emphasis added).  The ALJ stated that an impairment or combination of impairments is "not severe" if "medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." *Id*. at 12.  As set forth above, the ALJ determined that Claimant has severe impairments of fibromyalgia and degenerative disc disease.  R. 13.   In reaching his determination at step two of the sequential process, the ALJ reviewed the entire medical record and stated the following about all of Claimant's impairments:

> On January 5, 2005, Dr. Hasselbring diagnosed myalgias, arthralgias and she opined the [C]laimant met the criteria for a

23

diagnosis of fibromyalgia. I concur with her findings to the extent that I find the fibromyalgia is a severe impairment. I also find the [C]laimant's degenerative disc disease presents a severe impairment. A cervical MRI performed on March 8, 2004 revealed mild degenerative disc disease. A lumber MRI performed on January 30, 2003, revealed degenerative disc disease.

The [C]laimant also alleges problems with knees, feet and hands, obesity, bilateral hammer toes, upper respiratory problems, high blood pressure, foot drop, allergic rhinitis, sinusitis, irritable bowel syndrome, hemorrhoids, and borderline anemia. These impairments are all non-severe in nature.

The [C]laimant has foot drop (diagnosed first in June 2003), and bilateral hammer toes (diagnosed in December 2005). As to the foot drop, Dr. Ranganathan observed on June 3, 2004, that the [C]laimant was able to walk without an assistive device. Dr. Hasselbring went so far as to recommend a cane apparently for knee and foot problems. However, she also reported that the [C]laimant had no effusions and no instability in her knees. Dr. Hasselbring reported the [C]laimant had full range of motion bilaterally although she had marked crepitance bilaterally in her knees.[8] Dr. Hasselbring reported that the [C]laimant had hypertrophic changes at the great toe MTP and swelling at the right second toe. Dr. Hasselbring also reported the [C]laimant was able to make a full fist.

The [C]laimant injured the second toe on her right foot on approximately October 19, 2005. An x-ray taken on October 19, 2005, on the [C]laimant's right toe revealed hypertrophic changes in the second toe but no fracture. I note Dr. Hasselbring reported evidence of osteoarthritis of the knees, feet and hands, however in light of her findings above, and my review of the record, I find that the [C]laimant's feet, knees and hands, present non-severe impairments.

The [C]laimant is obsese. She is 66 inches tall and her weight has ranged from 211 pounds in December 2005 to 242 pounds in September 2003. It appears the most the [C]laimant has weighed during the period under adjudication was 260 pounds in November

---

[8] Crepitance is a "[n]oise or vibration produced by rubbing bone or irregular cartilage surfaces together as by movement of patella against femoral condyles in arthritis and other conditions." *Stedman's Medical Dictionary*, 26th Ed. (1995). In *Schnorr v. Bowen*, 816 F.2d 578, 580 (11th Cir. 1987), the Eleventh Circuit defined "crepitance" as "grinding of the joint[s]." *Id*.

2004. As discussed above, Dr. Hasselbring reported the [C]laimant had full range of motion bilaterally, no effusions and no instability in the knees.

The [C]laimant has had some upper respiratory problems and high blood pressure. The [C]laimant does not use any medications for the high blood pressure; the upper respiratory infections are acute in nature. These are non-severe impairments. The [C]laimant's allergic rhinitis, sinusitis, irritable bowel syndrome, borderline anemia, and hemorrhoids are also non-severe impairments.

The medical record reflects recent treatment for depression and anxiety. The consultative psychological evaluator, Dr. Clements, a licensed psychologist, evaluated the [C]laimant on June 2, 2004. Dr. Clements diagnosed pain disorder associated with both psychological and multiple medical problems and adjustment disorder with mixed anxiety and depression mood, chronic. A review of the [C]laimant's "B" criteria persuades me her mental impairments are non-severe.

I find the [C]laimant has mild limitations in activities of daily living, social functioning, concentration, persistence or pace and she has never had an episode of decompensation.

The [C]laimant reported reduced activities of daily living, but not due to significant mental health issues. The [C]laimant reported to Dr. Clements in June 2004 that she placed her resume on Monster.com. The [C]laimant reported to Dr. Ranganathan also in June 2004 that she tried to cook, clean, vacuum and mop; she was able to drive and do laundry. At the hearing, the [C]laimant reported that her activities of daily living include taking her grandchildren to the school bus, reading the Bible, and attending church on Sunday. She also reported at the hearing that she uses the computer very little, shops some and performs some housework.

The evidence does not support the presence of the "C" criteria.

R. 13-15. Thus, the ALJ determined that all of Claimant's other impairments, including her knees, feet, obesity, and depression, were not severe.

At step four of the sequential process, the ALJ determined Claimant's RFC for sedentary

25

work. R. 15-16. The ALJ stated that in making this determination he considered all of Claimant's symptoms in accordance with 20 CFR §§ 404.1529, 416.929 and Social Security Rulings ("SSR") 96-4p and 96-7p. R. 15. The ALJ also stated he considered the opinion evidence in accordance with 20 CFR §§ 404.1527, 416.927 and SSR 96-2p, 96-5p and 96-6p. R. 15.

The ALJ specifically considered Claimant's subjective complaints of pain and concluded that Claimant's medically determinable impairments could reasonably be expected to produce Claimant's alleged symptoms, but Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 15. The ALJ found Claimant's credibility to be "only fair." R. 15.

> The [C]laimant testified that her drop foot causes her to trip. The [C]laimant testified that she has pain from fibromyalgia. She reported that she takes 800 mg. of Ibuprofen three times a day. She also uses Zantac and Darvocet. At the hearing, the [C]laimant reported that her activities of daily living include taking her grandchildren to the school bus, reading the Bible and attending church on Sunday. She also reported at the hearing that she used the computer very little, shops some and performs some housework. Functionally, the [C]laimant testified that she could sit for 30 minutes and lift less than a gallon of milk. She was not sure how much she could stand. In the past, she testified that she could walk ¼ mile, but she cannot walk much now. The [C]laimant also reported greatly reduced activities due to pain at Exhibits 12E and 14E (completed in October 2004 by the [C]laimant); at Exhibit 13E (completed by the [C]laimant's daughter also in October 2004).
>
> The medical record does not support the [C]laimant's allegations. Imaging techniques reveal problems but not to the degree the [C]laimant alleges. A cervical MRI revealed only mild degenerative disc disease. A lumbar MRI revealed degenerative disc disease. The consultative evaluator, Dr. Ranganathan, reported on June 3, 2004, that the [C]laimant had decreased range of motion in the neck and back but no spasm and motor,

neurological and sensory examinations were within normal limits. As to the lower extremity problems, Dr. Ranganathan observed tha that the [C]laimant was able to walk without an assistive device. Dr. Hasselbring went so far as to recommend a cane. However, she also reported that the [C]laimant had no effusions and no instability in her knees. Dr. Hasselbring also noted that the [C]laimant had hypertrophic changes at the great toe MTP and swelling at the right second toe. An x-ray taken on October 19, 2005, on the [C]laimant's right toe revealed hypertrophic changes in the second toe but no fracture.

As for the opinion evidence, Dr. Hasselbring, who evaluated the [C]laimant at the request of Mr. Matthews, opined that the [C]laimant could perform in a sedentary position, as she performed in the past. I have relied on Dr. Hasselbring's opinion in coming to my conclusions as to the [C]laimant's [RFC]. Accordingly, I reject State Agency opinions at Exhibits 11F and 7F, both of which limited the [C]laimant to the light exertional level. Dr. Hasselbring had the opportunity to examine the [C]laimant as opposed to the non-examining State Agency physicians. Seminole Primary Care Treatment notes dated November 29, 2004, contain a disabled parking permit. I also not [sic] Exhibit 3F, page 5, a physician completed an application for a disability placard because of the [C]laimant's foot drop. I have not considered this opinion in coming to my conclusion as to the [C]laimant's [RFC]. This opinion expressed is conclusory in nature, providing no explanation of the evidence relied on in forming that opinion. I also reject a State Agency mental [RFC] at Exhibit 9F. I find the [C]laimant's mental impairments are non-severe. As such, they do not support any work related limitations.

R. 15-16. Thus, the ALJ determined that Plaintiff could perform sedentary work.

At step five of the sequential process, the ALJ determined that based on Claimant's RFC she could perform her past relevant work as an administrative assistant. R. 16-17. Accordingly, the ALJ found that Claimant was not under a disability. R. 17.

On March 17, 2006, Claimant requested review of the ALJ's decision before the Appeals Council. R. 7. On April 19, 2006, the Appeals Council denied review stating that it found no reason under its rules to review the ALJ's decision. R. 4. On September 4, 2008, Claimant

timely filed an appeal in this Court.  Doc. No. 1.[9]  On January 30, 2009 Claimant filed a memorandum in support of her position on appeal.  Doc. No. 8.  On April 10, 2009, the Commissioner filed a memorandum in support of the Commissioner's final determination.  Doc. No. 11.  The appeal is now ripe for review.

## IV.     LEGAL STANDARDS

### A.     THE ALJ'S FIVE STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has established a five step sequential evaluation process for determining whether an individual is disabled.  *See* 20 CFR §§ 404.1520(a), 416.920(a).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves performing significant physical or mental activities.  20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized.  20 CFR §§ 404.1572(b), 416.972(b).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA.  20 CFR §§ 404.1574, 404.1575, 416.974, 416.975.  If an individual is not engaging in SGA, the analysis proceeds to the second step.

---

[9] On August 7, 2008, the Appeals Council entered an order extending by thirty (30) days the time in which Claimant had to file a complaint with the district court.  *See* R. 3A-3D.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 CFR § 404.1521. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A mere diagnosis is insufficient to establish that an impairment is severe. *See Sellers v. Barnhart*, 246 F.Supp.2d 1201, 1211 (M.D. Ala. 2002) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). A claimant has the burden of proof to provide substantial evidence establishing that a physical or mental impairment has more than a minimal effect on a claimant's ability to perform basic work

activities. *See Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987). A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Comm'r*, 265 F.3d 1214, 1219 (11th Cir. 2001). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments. In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the

claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for

providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

**B.     THE STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## V.    ANALYSIS OF ALLEGED ERRORS

### A.  Whether the ALJ Erred At Step Two

Claimant maintains that the ALJ erred at step two by misrepresenting the extent and severity of her degenerative disc disease, and by failing to properly consider and find that Claimant's mental impairments, knee problems, and obesity, individually and in combination, were "severe" impairments at step two of the sequential analysis. Doc. No. 8 at 1, 4-5. The Commissioner asserts that substantial evidence existed for the ALJ to determine that the Claimant's mental impairments, knee problems, and obesity, individually and in combination with all other impairments were not "severe." Doc. No. 11 at 7-10, 14-16.

As set forth above, the ALJ must consider the combined effect of all of Claimant's impairments and the ALJ must make clear to the Court that he considered all alleged impairments, both individually and in combination. *See* supra pp. 29-30.[10]  If the medical or other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on Claimant's ability to work, then that impairment or combination of impairments is "not severe." *See* supra pp. 29-30; *see also* 20 CFR § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). "A diagnosis

---

[10] In *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986), the Eleventh Circuit found the following statement from an ALJ regarding the combined effects of all of a Claimant's impairments to be sufficient to satisfy the above standard:

> [B]ased on upon a thorough consideration of all evidence, the ALJ concludes that appellant is not suffering from any impairment, or a combination of impairments of sufficient severity to prevent him from engaging in substantial gainful activity for a period of at least twelve consecutive months.

*Id.* at 1076; *see also Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Sneed v. Barnhart*, 214 Fed.Appx. 883, 887 (11th Cir. 2006) (unpublished) ("The ALJ can satisfy this duty by stating that he considered whether the claimant suffered from any impairment or combination of impairments.").

alone is an insufficient basis for a finding that an impairment is severe." *Sellers v. Barnhart*, 246 F.Supp.2d 1201, 1211 (M.D. Ala. 2002) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). Claimant has the burden of proof to provide substantial, objective evidence establishing that alleged impairment(s) or any combination thereof have more than a minimal effect on her ability to perform basic work activities. *Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987); *see also* SSR 96-3p.

### (1) Degenerative Disc Disease

Claimant asserts that the ALJ's decision misrepresents and distorts the severity of Claimant's back condition. Doc. No. 8 at 4, 10 ("The ALJ's technique with regard to dealing with these opinions . . . is to either leave out what they said in its entirety . . . or to distort the severity of the impairment with regard to the low back."). In his decision, the ALJ reviewed the findings of two MRI's and specifically determined that Claimant's degenerative disc disease in her lumbar and cervical spine are severe impairments. R. 13. Thus, the undersigned recommends that the Court find Claimant's contention regarding Claimant's degenerative disc disease is meritless.

### (2) Depression

Regarding Claimants mental impairment(s), specifically depression, Claimant did not allege that she suffered from depression until the reconsideration level. *See* supra n. 5. At the initial consideration level, Claimant acknowledged taking an anti-depressant, Effexor, but stated it was prescribed to treat her pain from fibromyalgia rather than depression. R. 98. Other than being evaluated by Dr. Clements, a mental health consultative examiner, the record shows that Claimant has not sought any mental health treatment. *See* R. 202. While the record contains

numerous references to Claimant's depression (*see* R. 165-66, 183, 185, 202-05, 207, 218-31, 259-60, 232-42, 278-79, 314), the records from Claimant's treating physicians, Dr. Hasselbring (a consultative examiner), Dr. Ranganathan (a consultative examiner), and Dr. Jung (a non-examining consultant) show that they did not recommend Claimant seek treatment for depression and that Effexor and later Cymbalta were effective at treating Claimant's depression. R. 181-90, 206-07, 218-30, 258-60.[11]  Although Dr. Hasselbring stated that Claimant suffered from "severe depression" in January of 2005, after the sudden death of her husband, she ultimately opined that Claimant is capable of performing her past relevant work as an administrative assistant and referred Claimant for vocational training.  R. 260. Dr. Clements evaluation found that Claimant did not suffer from any significant cognitive impairment and that her prognosis was fair.  R. 204. Dr. Weber, a non-examining consultant, opined that Claimant's depression would have a moderate effect on her ability to perform activities of daily living and ability to maintain concentration, but also stated that Claimant's functional limitations are "mainly attributable to physical condition[s]."  R. 232-34. At the hearing, Claimant testified that attending church and talking with friends helps with her depression.  R. 399.  The ALJ utilized Dr. Clements' evaluation and opinion at step two of the sequential analysis and determined that Claimant's depression only had a mild effect on her ability to perform basic work activities and, therefore, was not a severe impairment.  R. 14-15.  Based on the forgoing, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Claimant's depression was not severe because there is no showing that Claimant's depression limits her ability to perform basic work activities.  *See generally Freeman v. Barnhart*, 220 Fed.Appx. 957,

---

[11] On June 2, 2004, Dr. Clements did recommend Claimant seek further mental health treatment, but the record does not contain any evidence that Claimant sought such treatment.  R. 204.

961 (11th Cir. 2007) (unpublished) (substantial evidence existed showing Claimant's mental impairments only had a minimal effect on ability to do basic work skills); *see also Edwards*, 937 F.2d at 584 n. 3 (holding that the district court will affirm if substantial evidence supports Commissioner's decision even if other evidence preponderates against said decision).

### (3) Knees

Regarding Claimant's knee impairments, the record is void of any serious knee ailments. In 1999, Dr. Pyke reported that a physical examination of Claimant's knees was unremarkable. R. 301. Dr. Hostetler's notes show Plaintiff received some relief of pain through Ibuprofen and Darvocet as need at night. R. 190. On August 29, 2003, Dr. Arnold, an orthopedic surgeon, stated that Claimant "has no mechanical symptoms, instability, loss of [range of motion], or chronic swelling" in her knees. R. 200. Physical examination of Claimant's left knee was normal. R. 200. Physical examination of Claimant's right knee showed a slight loss of range of motion, but no significant pain or laxity from various stress testing. R. 200. Dr. Arnold found no significant degenerative changes in her knees and did not recommend any surgical intervention. R. 201. Furthermore, Dr. Arnold stated that Claimant receives some relief of pain through Ibuprofen and Darvocet. R. 200. Dr. Arnold recommended conservative treatment, specifically an aggressive home exercise program. R. 201. On October 10, 2003, Claimant showed "significant improvement" in the right knee and Dr. Arnold recommended that she continue the home exercise program. R. 199. On June 3, 2004, Dr. Ranganathan (a consultative examiner) noted that Claimant's motor strength was 5/5 bilaterally, she was able to walk without assistive devices, she was able to get on and off the examination table and able to remove her shoes and pants without difficulty. R. 206-07. On January 5, 2005, Dr. Hasselbring (a

consultative examiner) reported that no effusions or instabilities were present in Claimant's knees and she had a full range of motion bilaterally, but she did have marked crepitance in both knees. R. 259. The ALJ reviewed Dr. Ranganathan and Dr. Hasselbring's reports and determined that Claimant's knee problems were not severe. R. 13-14. The undersigned recommends that the Court find substantial evidence exists supporting the ALJ's determination that Claimant's knee impairments were not severe because there is no showing that Claimant's knee impairments limit her ability to perform basic work activities.

### (4) Obesity

The record, as the ALJ acknowledges, supports that Claimant suffers from obesity and was told to lose weight by her treating physicians and consultative examiners. R. 14, 240, 260, 259, 298, 300-01, 340. Dr. Hasselbring (a consultative examiner) opined that Claimant's obesity contributes to her lower extremity problems. R. 260. However, the record also shows that Claimants strength, range of motion, flexion, and gross motor function remain largely normal despite her obesity, and she suffers from no instability in her knees. R. 165-167, 199-201, 203, 207, 259-60, 268-75, 298. Claimant did not allege obesity as a disabling condition at the initial evaluation level, at the reconsideration level, or through questioning by her attorney at the hearing. R. 80, 380-410. Moreover, Claimant did not submit evidence showing that she suffered a particular functional limitation as a result of her obesity. In his decision, the ALJ notes that Dr. Hasselbring found she had a full range of motion bilaterally, no effusions, and no instability in her knees and, therefore, the ALJ concluded that Claimant's obesity is not severe. R. 14.

Claimant argues that "[i]t is inconceivable that an individual with that much weight who is determined to be obese, that such obesity would not have more than a minimal effect upon the

ability to work in terms of standing and walking." Doc. No. 8 at 5. Claimant urges this Court, in effect, to form its own medical opinion and engage in speculation regarding Claimant's obesity. However, it is improper engage in such speculation or reweigh the evidence. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).

Claimant also argues that the ALJ erred by failing to utilize SSR 02-1p, 2000 WL 628049 (S.S.A. 2002), at step two of the sequential process when analyzing Claimant's obesity. Doc. No. 8 at 6-7. SSR 02-1p provides that obesity will be analyzed at step two in the same manner as any other impairment. *See* 2000 WL 628049 at *4. Moreover, SSR 02-1p states that the various levels of obesity "do not correlate with any specific degree of functional loss." *Id*. at *2. The ALJ found that Claimant suffers from obesity, but her impairment only has a minimal impact on her ability to perform basic work activities. R. 14. Given the record in this case, the undersigned recommends that the Court find substantial evidence supports the ALJ's determination that Claimant's obesity is not severe.

### (5) Consideration of Impairments

As set forth above, the ALJ stated that he had a duty to consider all of Claimant's impairments individually and in combination. *See* R. 12; *see also* supra p. 23. The ALJ stated that he did consider all of Claimants alleged impairments in accordance with 20 CFR § 404.1520(c) which provides that an ALJ will consider a claimant's impairments individually and in combination. *Id*.; R. 13. The ALJ then provided a detailed description and analysis of all of Claimant's alleged impairments. *See* supra pp. 23-25; R. 13-15. Thus, the undersigned recommends that the Court find that the ALJ properly considered all of Claimant's impairments

individually and in combination. *See Wheeler*, 784 F.2d at 1076; *Jones*, 941 F.2d at 1533; *Sneed*, 214 Fed.Appx. at 887.

### B. Whether the ALJ Erred Weighing the Evidence

Claimant argues that the ALJ erred in weighing the evidence by: improperly rejecting Dr. Webber's opinions; failing to state the specific weight afforded to the opinions of Drs. Clements, including his GAF score of 50, Ranganathan, Braun-Hashemi, Arnold, and Hostetler; and by substituting his own medical opinion for the opinions of Claimant's treating physicians. Doc. No. 8 at 8-11. Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the ALJ's sequential process for determining disability. As a general rule, the ALJ must state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). [12] The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Absent good cause, the opinions of treating or examining physicians must be accorded substantial or considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

> Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir.2004) (citations omitted); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986).

*Johnson v. Barnhart*, 138 Fed.Appx. 266, 269 (11th Cir. 2005).

---

[12] The Regulations maintain that an ALJ "will always give good reasons in [their] . . . decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

### (1) Dr. Webber's Non-Examining Opinion

Claimant argues that the ALJ improperly rejected Dr. Webber's (a non-examining consultant) opinions "without offering any reason other than the fact that [the ALJ] finds such impairments not to be severe." Doc. No. 8 at 8. The Commissioner maintains that the ALJ properly rejected Dr. Webber's opinions and, alternatively, if the ALJ failed to properly reject his opinions, such error is harmless. Doc. No. 11 at 10. In his decision, by implication the ALJ rejected Dr. Webber's opinions because they are contrary to his finding that Claimant's mental impairments are not severe. R. 16. Substantial evidence supports the ALJ's determination that Claimant's mental health impairments are not severe. *See* supra pp. 34-36. As set forth above, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock,* 764 F.2d at 835. Moreover, when taken alone, the opinions of non-examining physicians do not constitute substantial evidence. *See Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). Thus, the undersigned recommends that the Court find the ALJ did not err by implicitly rejecting the opinion of Dr. Webber because substantial evidence supports the ALJ's finding that Claimant's mental impairments were not severe and Dr. Webber's opinion, standing alone, is not substantial evidence.

### (2) Weighing Various Treating And Examining Medical Opinions

#### a. Dr. Clements' Opinions

Claimant maintains that the ALJ erred by failing to state the weight afforded to the opinions of Dr. Clements, including failing to mention Claimant's GAF score. Doc. No. 8 at 8-11. Dr. Clements opined that Claimant did not suffer from any significant cognitive impairment and stated that Claimant's prognosis was fair. *See* R. 204. In his decision, the ALJ reviewed Dr.

Clements' diagnoses and stated that a review of the "B Criteria" led him to conclude that Claimant's mental impairments were not severe. R. 14. Thus, the ALJ utilized Dr. Clements' report and opinions in support of his determination that Claimant did not suffer from any severe mental impairment. *See Wright v. Barnhart*, 153 Fed.Appx. 678, 684 (11th Cir. 2005) (unpublished) ("Although the ALJ did not explicitly state what weight he afforded the opinions of [various doctors], none of their opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless.") (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)). Accordingly, the undersigned recommends that the Court find the ALJ did not err by failing to state the specific weight he afforded to Dr. Clements' opinion.[13]

### b. Dr. Clements' GAF Score

In his decision, the ALJ does not specifically mention the GAF score of 50 assigned by Dr. Clements. *See* R. 11-17. Claimant argues that the ALJ's failure to specifically mention and weigh the GAF score requires reversal. Doc. No. 8 at 7-8. A GAF score of 50 or below indicate that the individual has a severe impairment. *See* 5 Social Security Practice Guide § 40.02[2] (Matthew Bender & Co. 2000). "The Global Assessment of Functioning Scale is used to report an individual's overall level of functioning." *Newsome ex rel. Bell v. Barnhart*, 444 F.Supp.2d 1195, 1198 (M.D. Ala. 2006) (citing Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition 1994) ("DSM-IV")). The Commissioner's regulations provide that GAF scores have no "'direct correlation to the severity requirements of the mental disorder listings.'" *Wind v. Barnhart*, 133 Fed.Appx. 684, 692 n. 5 (11th Cir. 2005) (quoting Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)); *See also Kennedy v. Astrue*, 247 Fed.Appx. 761, 766 (6th Cir. 2007) (GAF

---

[13] The Claimant also argues that the ALJ rejected Dr. Clements' opinion. *See* Doc. No. 8 at 9. However, it is apparent that the ALJ utilized Dr. Clements opinion and report when determining Claimant's mental impairments were not severe. R. 14.

scores have no direct correlation to the severity requirements of mental disorder listings); *Vanhaerents v. Astrue*, 8:07-cv-2263-T-TGW, 2009 WL 1491450 at *5 (M.D. Fla. May 27, 2009) ("[A] GAF score is of limited, if not questionable value."). In an unpublished case, the Eleventh Circuit remanded a case back to the Commissioner, in part, because the ALJ did not consider or ascribe any particular weight to two different GAF scores and erroneously stated that another GAF score reflected only moderate symptoms. *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418 (11th Cir. 2006) (unpublished). However, other cases have held that an ALJ's failure to mention a GAF score does not warrant reversal. *McFarland v. Astrue*, 288 Fed.Appx. 357, 359 (9th Cir. 2008) ("[T]he ALJ's failure to address three GAF scores specifically does not constitute legal error."); *Lee v. Barnhart*, 117 Fed.Appx. 674, 678 (10th Cir. 2004) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work."); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002) ("[T]he ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). Moreover, in the Eleventh Circuit, there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," so long as the ALJ's decision enables a reviewing court to conclude that the ALJ considered the claimant's entire medical condition. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Dr. Clements ultimately opined that Claimant did not suffer from a significant cognitive impairment and the ALJ utilized that opinion when he determined that Claimant's mental impairments were not severe. R. 204. Thus, the undersigned recommends that the Court find that the ALJ's failure to specifically mention and weigh a single GAF score does not demonstrate that the ALJ failed to consider Claimant's entire medical condition, and does not warrant reversal. *See e.g. Fisher v.*

*Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principal of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

### c. Other Medical Opinions

Claimant correctly states that the ALJ failed to discuss or state the specific weight he afforded to the records and opinions of Drs. Ranganathan, Braun-Hashemi, Arnold, and Hostetler. Doc. No. 8 at 8-11; R. 11-17. As set forth above (*see* supra p. 41), it is harmless error if an ALJ fails to mention or weigh certain opinions if those opinions do not contradict the ALJ's determination. *See Wright*, 153 Fed.Appx. at 684; *Diorio*, 721 F.2d at 728.

Dr. Ranganathan (a consultative examiner) offered no opinion as to Claimant's ability to work. *See* R. 206-07. Dr. Ranganathan opined that Claimant suffered from degenerative disease of the lumbar and cervical spine and fibromyalgia, both conditions which the ALJ found to be severe impairments. *See* R. 13, 206-07. Dr. Ranganathan also found Claimant's motor strength, sensory system, and reflexes were essentially normal. R. 206-07. Dr. Ranganathan's evaluation supports the ALJ's decision on the whole, and ALJ discussed Dr. Ranganathan's records in his decision. *See* R. 14, 16.

Dr. Braun-Hashemi performed nerve conduction studies on Claimant which revealed only "very minor sensory neuropathy." R. 169. MRI's of the lumbar and cervical spine showed some degenerative disc disease and Dr. Braun-Hashemi recommended conservative treatment instead of surgical intervention. R. 168. Dr. Braun-Hashemi did not offer an opinion regarding whether Claimant was disabled, and her records on the whole support the ALJ's decision. Similarly, Dr. Arnold's records, including x-rays, reveal no significant impairment in Claimant's

knees and significant improvement in her range of motion and pain with conservative treatment. R. 199-201. In a letter to the Commissioner, Dr. Arnold stated that he could not comment on Claimant's current ability to do work related activities because he had not treated her in over six months. R. 198. Dr. Hostetler's records, including x-rays and MRIs, show some degenerative disc disease and some relief of symptoms through conservative treatment. R. 181, 185-86, 195. Dr. Hostetler did not offer an opinion regarding Claimant's ability to do work related activities. Notably, none of these doctors opined that Claimant was totally disabled or suffered marked impairments in functioning due to her impairments. Thus, while the ALJ failed to state a specific weight to the records and opinions of various doctors, the undersigned recommends that the Court find such errors do not warrant reversal because those records and opinions support the ALJ's determination. *See Wright*, 153 Fed.Appx. at 684.

### (3) Whether the ALJ Erred By Substituting His Opinion

In conclusory fashion, Claimant maintains that the ALJ substituted his opinion for those of the treating physicians. Doc. No. 8 at 10. After a careful review of the entire record and the ALJ's decision, the undersigned recommends that the Court find Claimant's contention is meritless because the ALJ's determination is supported by the records of Claimant's treating and examining doctors.

### C. Whether the ALJ Erred In Determining RFC

Claimant argues that the ALJ erred in determining Claimant's RFC by failing to utilize SSR 96-8p, finding Claimant's credibility was only fair, and by not mentioning the side effects of Claimant's medications. Doc. No. 8 at 9, 11-14.

**(1) SSR-96-8p**

SSR 96-8p, 1996 WL 374184 (1996), sets forth the requirements for determining an individual's RFC and states that an RFC is the most an individual can do despite his or her impairments. Claimant maintains that the ALJ failed to utilize SSR 96-8p when determining Claimants' RFC because the ALJ failed to take into account Dr. Clements' GAF score and Dr. Webber's opinion. Doc. No. 8 at 12-14. As set forth above, the ALJ properly rejected Dr. Webber's opinion and did not err by failing to mention the GAF score. *See* supra pp. 41-43. Moreover, the ALJ stated that in determining Claimant's RFC he considered all of her symptoms and the opinion evidence in the record. R. 15. According, the undersigned recommends that the Court find the ALJ did not err by failing to utilize SSR 96-8p.

**(2) Whether the ALJ Erred By Finding Claimant's Credibility Only Fair**

Claimant asserts that the ALJ erred by failing to specifically outline why he found Claimant's credibility to be only fair when other doctors found her to be credible. Doc. No. 8 at 11-12.

In the Eleventh Circuit, subjective complaints of pain are governed by a three-part "pain standard" that applies when a claimant attempts to establish disability through subjective symptoms. By this standard, there must be: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged symptom arising from the condition or (3) evidence that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). "20 C.F.R. § 404.1529 provides that once such an impairment is established, all

evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote*, 67 F.3d at 1561; 20 C.F.R. § 404.1529. Thus once the pain standard is satisfied, the issue becomes one of credibility.

A claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561. "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. A reviewing court will not disturb a clearly articulated credibility finding <u>with substantial supporting evidence in the record</u>. *Id.* at 1562 (emphasis added). The failure of the ALJ to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *Id.* The lack of a sufficiently explicit credibility finding may give grounds for a remand if the credibility is critical to the outcome of the case. *Id.* If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562 (*quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court)). Thus, where credibility is a determinative factor, the ALJ must explicitly discredit the testimony or the implication must be so clear as to amount to a specific credibility finding. *Foote*, 67 F.3d at 1561; 20 C.F.R. § 404.1529.

In this case, the pain standard was satisfied because the ALJ found that Claimant's medically determinable impairments, fibromyalgia and degenerative disc disease, could

reasonably be expected to produce the alleged symptoms.  R. 15; *see* supra p. 26.  However, the ALJ also determined that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."   R. 15.  In making this determination, the ALJ reviewed Claimant's testimony regarding the limitations caused by her pain, including her activities of daily living (R. 15), the laboratory testing such as MRI's and x-rays (R. 15-16), Dr. Ranganathan's report showing normal motor, neurological and sensory examinations and Claimant's ability to walk without assistive devices (R. 16), and Dr. Hasselbring's opinion that Claimant could perform sedentary work (R. 16).  R. 15-16; *see* supra pp. 26-27.  The ALJ then concluded that "[t]he medical record does not support the [C]laimant's allegations."  R. 15; *see* supra p. 26. Thus, the ALJ specifically discredited Claimant's testimony and provided reasons for his determination.

The Eleventh Circuit has held that it is improper to reject a claimant's testimony solely on a lack of objective evidence documenting fibromyalgia.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  However, in this case, the ALJ did not discredit Claimant's testimony solely on the basis of a lack of any laboratory testing supporting her allegations of disabling pain.  Rather, the ALJ accepted that Claimant suffered from a severe impairment of fibromyalgia, but found the entire medical record, including the opinion of Claimant's own expert, Dr. Hasselbring, did not support Claimant's allegation that her pain precluded her from all work. R. 15-16.  *See Wekwert v. Astrue*, 8:08-cv-471-T-TGW, 2009 WL 700599 at *4-7 (M.D. Fla. May 17, 2009) (holding ALJ properly discredited Claimant's testimony concerning pain due to fibromyalgia because the entire medical record, including the medical opinions, treatment notes, and laboratory testing did not support her contention that she was totally disabled due to pain).

After a careful review of the evidence, including the Claimant's testimony, self reported activities of daily living, medical records, opinion evidence, and laboratory testing, the undersigned recommends that the Court find that substantial evidence exists supporting the ALJ's credibility determination and that the ALJ provided adequate reasons for said determination because the record evidence does not support Claimant's testimony as to the severity of her pain. *See* R. 165, 167-71, 173-74, 185-86, 190,195, 199-201, 268-69, 271-72, 274-75, 381-409.

### (2) Whether the ALJ Erred By Failing To Discuss the Side Effects of Claimant's Medication

Claimant states that the ALJ failed to "mention . . . medication side effects testified to by [Claimant] at page 405 [of the record] and also noted by Dr. Clements at page 204 [of the record]. Doc. No. 8 at 9. Claimant does not request any specific relief or cite to any case law or regulatory support for this alleged error, but does raise it as an issue. *Id*. At the hearing, Claimant testified that she was currently taking Ibuprofen, Zantac, and Darvocet. R. 405. Claimant stated that the medications cause her to be drowsy and dizzy, and that they affected her ability to work. R. 405. Claimant reported to Dr. Clements that she only takes Darvocet when needed due to headaches. R. 203. The record shows that she has taken 800mg of Ibuprofen since the late 1990's with no reported side effects. R. 190, 281, 340. On or about June 6, 2003, Claimant was placed on Darvocet, but only as needed for pain. R. 186. On August 7, 2003, Claimant was placed on Effexor for pain with favorable results. R. 165-66, 183, 185. On January 5, 2005, Claimant reported to Dr. Hasselbring that she had replaced Effexor with Cymbalta with favorable results. R. 258. Claimant also stated that she had discontinued taking Darvocet due to headaches. R. 258. In his decision, the ALJ does not specifically mention the

side effects of Claimant's medications. However, the ALJ properly discredited Claimant's subjective testimony, and considered Dr. Clements' report and opinions in light of the "B" criteria. Thus, the undersigned recommends that the ALJ's failure to mention the side effects of Claimant's medication(s) does not warrant reversal. *See e.g. Holley v. Chater*, 931 F.Supp. 840, 850 (S.D. Fla. 1996).

## VI.    CONCLUSION

Based on the above stated reasons, the undersigned **RECOMMENDS** that the Court:

1)  **AFFIRM** the final decision of the Commissioner;

2)  Direct the Clerk to enter a separate judgment in favor of the Commissioner; and

3)  Direct the Clerk to close the case.

Failure to file written objections to the proposed findings and recommendations contained in this report within **eleven (11) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** in Orlando, Florida on August 21, 2009.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies to:
Presiding District Judge

**The Court Requests that the Clerk:**
**Return the Record to the Tampa Division**
Mail or Deliver Copies of this Order to:

Roger W. Plata
Roger W. Plata & Associates, P.A.
3510 First Avenue North, Suite 129

St. Petersburg, FL 33733

Susan R. Waldron
U.S. Attorney's Office
Suite 3200
400 N. Tampa St.
Tampa, Florida          33602

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Richard V. Blake, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920


The Honorable John T. Yeary
Administrative Law Judge
c/o Social Security Administration
Office of Disability Hearings and Appeals
Charleston Federal Center
500 Quarrier St., Suite 100
Charleston, WV 25301